1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

THE CITY OF RENTON, a Washington
municipal corporation, et al.,

Plaintiffs,

v.

LEXINGTON INSURANCE COMPANY
(USA), a foreign corporation doing business in
Washington; et al.,

Defendants.

CASE NO. C06-203RSM

ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT

This matter is before the Court for consideration of the parties' cross-motions for summary judgment. Dkt. ## 57, 80. Plaintiff has also filed a motion to strike portions of defendants' exhibits. Dkt. # 90. The matter has been fully briefed and, although the parties have requested oral argument, the Court deems it unnecessary. For the reasons set forth below, the Court shall GRANT plaintiffs' motion to strike, DENY plaintiffs' motion for partial summary judgment, and GRANT defendants' motion for summary judgment.

FACTUAL BACKGROUND

Plaintiffs City of Renton ("City") and the Washington Cities Insurance Authority ("WCIA") filed this action for breach of contract, alleging that defendants improperly failed to pay an insurance claim. The named defendants, Lexington Insurance Company (USA) ("Lexington USA") and Lexington Insurance Company (UK) ("Lexington UK"), are reinsurers as explained further below. The facts giving rise to the insurance claim are not in dispute. By both moving for summary judgment, the parties are in

ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT - 1

agreement that the matter of insurance coverage is an issue of law for the Court.

The underlying facts shall be stated as summarized by plaintiff:

The Monster Road Bridge ("Bridge") is a 1887-foot long, three-span structure comprised of seven girders per span located within the City of Renton, Washington. The Bridge was designed by INCA Engineers. After the Bridge's completion in early 1999, Renton inspected the Bridge biannually per State of Washington mandated requirements, commencing on September 7, 1999. During this initial inspection, the inspector noted that all interior center span girders had cracks in the bottom flange at each end near the bents. After a third biannual inspection on [sic] September 2003, Renton asked CES Engineering to do a full inspection study as to the magnitude of cracks as it appeared the Bridge may have been subject to total failure in the future. Eventually, these cracks worsened to the point that the Bridge required extensive repairs in order to continue safely operating.

Renton went through the formal public bidding process for awarding the repair bid, which was concluded on September 28, 2004. The repairs were completed by Mowat Construction. The total costs expended by Renton to repair the Bridge were $690,643.41, completed around July 11, 2005.

Plaintiff's Opposition to Summary Judgment, Dkt. # 90, p. 2 (citations to record omitted).

Plaintiff further describes the insurance coverage on the Bridge as follows:

Renton insured the Bridge against direct physical loss or damage under manuscript WCIA pool policies for several years, including December 31, 1998 to December 31, 1999. Renton was a named insured on the WCIA policy. WCIA purchased reinsurance from Lexington, which followed the underlying WCIA policy. Lexington provided $10 million of facultative reinsurance above WCIA's $25,000 deductible under two reinsurance certificates:

| | | |
|---|---|---|
| $7,500,000 part of $10,000,000 | Lexington (USA) | Cert. No. 852 3449 |
| $2,500,000 part of $10,000,000 | Lexington (UK) | Cert. No. LU 9827313[1] |

. . . .

Renton tendered the Bridge claim to WCIA on or about February 12, 2004. WCIA, in turn, notified Crawford Technical Services ("Crawford") on February 18, 2004. Lexington, as well as other insurers covering the Bridge from 1998 forward, was notified through Driver Alliant Insurance Services on February 19, 2004. Lexington initially adjusted the claim under the 2003/04 policy in London; John Kelly handled the matter for Lexington in London. Lexington, through Crawford, hired bridge structural engineering consultant, Allan Walley, P.E., and soils engineering consultant, Paul Grand with PanGeo Engineering to investigate the loss.

On March 26, 2004, John Kelly wrote Gregg Zimmerman at Renton, acknowledging receipt of the claim and reserving rights. In this letter, Mr. Kelly cited some exclusions in the 2003/04 policy and other defenses but he did not set forth any definitive facts indicating which of them might apply, and why. On December 17, 2004, John Kelly wrote Gregg Zimmerman again, denying coverage based on the 2003/04 policy exclusion for "error in design:"

---

[1]This portion of plaintiff's statement appears to be in dispute, as set forth more fully below. The dispute over the policy number is not a material issue of fact to prevent summary judgment.

ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT - 2

According to the expert opinion of Mr. Walley and Mr. Grant, the predominant cause of the loss was "error in design," which is an excluded peril under the Lexington policy.  Under Washington law, it is the predominant cause which determines coverage—if the predominant cause is an excluded peril, there is no coverage.

Mr. Kelly attached the Walley and Grant reports as attachments to this denial letter.  There is no mention of "creep."

Around mid-April 2005, William F. Lamond, Jr. of Lexington's boston office allegedly became involved under the 1998/99 policy.  Four months later, on August 10, 2005, Lexington reserved rights under the 1998/99 coverage.  The "inherent vice" exclusion was listed in the reservation of rights, but there was no discussion of its application.  Two months later, on October 10, 2005, Lexington denied coverage under the 1998/99 Lexington term, referring to John Kelly's December 17, 2004 denial letter.  Citing the "inherent vice" exclusion (which notably did not include "errors in design" for this earlier policy year), Mr. Lamond stated:

As we understand the facts, experts evaluating the condition of the Bridge have concluded that bridge cracks are not attributable to external events such as rain, wind, earthquake, etc.  Instead, the information provided to date indicates that the structural integrity of the bridge was deficient from the outset.  Whether due to welding deficiencies or improper design, experts have opined that the pre-stressed girders were simply never in an initial satisfactory state of completion.  For this reason, it does not appear at this time that the condition of the Bridge falls within the insuring provision of the WCIA Policy, which insures against "all risk of direct physical loss or damage."  WCIA Policy, Section IV "General Conditions," ¶ 1.

*Id.*, pp. 2-4 (citations to record omitted).

Plaintiff's recitation of the facts neglects to mention that on September 14, 2004, the City filed suit in state court against Inca Engineers, Inc., the designer of the bridge, and that the matter was settled for the sum of $450,000 in November 2005.  Further, plaintiff did not state that on April 12, 2007, prior to the date plaintiff's factual recitation was written, WCIA paid the City the sum of $248,892[2].

Defendants have moved for summary judgment of dismissal of all claims, asserting they have no liability in this matter under the relevant policies as a matter of law.   Dkt. # 57.  Plaintiffs have moved for partial summary judgment on five bases, namely that (1) defendants must "follow the fortunes and settlements" of its reinsured, WCIA; (2) defendants are jointly and severally liable for the progressive damage to the bridge; (3) the "inherent vice" exclusion does not apply; (4) defendants' "late notice" defense must be dismissed; and (5) defendants' "suit limitations" defense must be dismissed.  Dkt. # 80.

---

[2]This amount was adjusted to $223,892, subtracting the $25,000 deductible, on April 17, 2007.

ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT - 3

1   Plaintiffs have also moved, in their opposition to defendants' motion, to strike certain portions of

2   the materials filed by defendants in support of their motion.  As to the statements at deposition of Gregg

3   Zimmerman, Exhibits C and D to the Declaration of Jeffrey Gesell, and Exhibit C to the Declaration of

4   Joseph Bozick, the motion to strike shall be GRANTED.  As to Exhibit H to the Gesell Declaration, the

5   motion to strike shall be DENIED, as these same documents appear elsewhere in the record, one of them

6   filed by plaintiffs.  Dkt. # 85, Declaration of Lew Leigh, Exhibit B; Dkt. # 87, Declaration of Paul Hine.

7                                                    ANALYSIS

8   In moving for summary judgment, defendants have presented argument on the evidence to show

9   that error in design of the bridge was the cause of the City's loss.  However, in their own subsequent

10  motion, plaintiffs assert that "the parties agree that error in design was the efficient proximate cause of

11  the loss."  Plaintiffs' Motion, Dkt. # 80, p. 10.   As the parties agree on that point, they ask the Court to

12  decide, as a matter of law, whether the City's loss was covered under the relevant insurance policies, and

13  applicable principles of reinsurance.

14  The following discussion of the topic of reinsurance by the Third Circuit Court of Appeals is most

15  helpful to an understanding of the parties' relative positions, rights and duties in this matter.

16      Primary insurers, excess insurers, and reinsurers play different roles in the insurance industry.
        Both primary and excess insurers provide coverage directly to the insured policy holder.
17      Primary insurance policies describe what kinds of liability will be covered and specify dollar limits.
        Excess insurers typically track the coverage offered by the primary insurer and also specify dollar
18      limits, but the excess insurer's liability is not triggered until the primary insurer's limit is exhausted.
        Reinsurers do not provide coverage directly to the insured but issue certificates of reinsurance to
19      the excess or primary insurer, also specifying dollar limits.

20      Reinsurance is purchased by insurance companies to insure their liability under policies written to
        their insureds. *See* Henry T. Kramer, *The Nature of Reinsurance, in Reinsurance, supra,* at 117, 121.
21      Strain ed., 1980). Typically, an insurer who has provided coverage against a large loss will
        cede all or part of that risk to other insurance companies along with a portion of the premiums.
22      Ceding risk increases the insurer's capacity to insure other customers and decreases the
        likelihood that insurer insolvency will result from any large claim.
23

24      There are two types of reinsurance contract: treaty and facultative. Under a reinsurance treaty,
        the reinsurer agrees to accept an entire block of business from the reinsured. William G. Clark,
25      *Facultative Reinsurance: Reinsuring Individual Policies, in Reinsurance, supra,* at 117, 121.
        Once a treaty is written, a reinsurer is bound to accept all of the policies under the block of
26      business, including those as yet unwritten. Because a treaty reinsurer accepts an entire block of
        business, it does not assess the individual risks being reinsured; rather, it evaluates the overall risk
27      pool. *Id.*

28      Facultative reinsurance entails the ceding of a particular risk or policy. Unlike a treaty reinsurer

ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT - 4

who must accept all covered business, the facultative reinsurer assesses the unique characteristics of each policy to determine whether to reinsure the risk, and at what price. Thus, a facultative reinsurer "retains the faculty, or option, to accept or reject any risk." *Id.; see also* Francis M. Gregory, Jr. & Nicholas T. Christakos, *Primary, Excess, and Reinsurance Problems in Large Loss Cases*, 59 Def. Couns.J. 540, 543 (1992). ("[T]he distinguishing characteristic is always the reinsurer's right of individual risk rejection.").

The reinsurance relationship depends on the reinsurer and the reinsured observing high levels of good faith. *See Unigard Sec. Ins. Co. v. North River Ins. Co.*, 4 F. 3d 1049, 1069 (2d Cir. 1993). The reinsured must keep its interests aligned with those of the reinsurer, *see id.,* and the reinsurer must "follow the fortunes" of the reinsured, *see Kramer, supra,* at 12-13.

Reinsurance certificates usually employ standard forms. A reinsurance certificate typically includes a "following forms" provision that expressly limits the reinsurance to the terms and conditions of the underlying policy and provides that the reinsurance certificate will cover only the kinds of liability covered in the original policy issued to the insured. The reinsurance certificate often . . . also includes a "follow the fortunes" clause, which is somewhat broader than the "following forms" clause and obligates the reinsurer to indemnify the reinsured for any good faith payment of an insured loss.

"Follow the fortunes" clauses prevent reinsurers from second guessing good-faith settlements and obtaining de novo review of judgments of the reinsured's liability to its insured. *See International Surplus Lines Ins. Co. v. Certain Underwriters & Underwriter Syndicates at Lloyd's of London*, 868 F. Supp. 917, 921 (S.D.Ohio 1994). ("Were the Court to conduct a de novo review of [the reinsured's] decision-making process, the foundation of the cedent-reinsurer relationship would be forever damaged."). But while a "follow the fortunes" clause limits a reinsurer's defenses, it does not make a reinsurer liable for risks beyond what was agreed upon in the reinsurance certificate. *See Bellefonte Reinsurance Co. v. Aetna Casualty & Surety Co.*, 903 F. 2d 910, 914 (2d cir. 1990); *see also Kramer, supra,* at 13 ("[T]he concept of follow the fortunes cannot create a reinsurance where none exists."). In that regard, the reinsurer retains the right to question whether the reinsured's liability stems from an unreinsured loss. A loss would be unreinsured if it was not contemplated by the original insurance policy or if it was expressly excluded by terms of the certificate of reinsurance.

*North River Insurance Co. v. Cigna Reinsurance Co.*, 52 F. 3d 1194, 1198-1201 (3d Cir. 1995).

Here, WCIA is the primary insurer, and Lexington is the reinsurer under certificates of facultative reinsurance issued by Lexington to WCIA. Plaintiffs contend that defendants are obligated under the "follow the fortunes and settlements" rule to reimburse its reinsured WCIA for the $223,892 that WCIA, as primary insurer, has paid to the City. Defendants, both in their own summary judgment motion and in opposing plaintiffs' motion, assert that the City's loss was not a loss covered by the WCIA policy, and any payment by WCIA was not made in good faith. Therefore, they assert, there is no obligation on the part of the reinsurers to cover the loss by reimbursing WCIA for the payment to the City.

WCIA provides $10,000,000 of primary "all-risk" insurance to its member cities, including the City of Renton. Declaration of Jeffrey Gesell, Dkt. # 63, Exhibit G. The summary page for the policy

ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT - 5

1   period December 31, 1998 to December 31, 1999 indicates that the policy is reinsured by Lexington

2   Insurance Company (US), Certificate No. 8523449 ($7,500,000), and by Lexington Insurance Company

3   (UK), Certificate No. 9827313 ($2,500,000).  *Id*., p. 44.  Elsewhere in the policy documents provided by

4   defendants, this second certificate number is listed as "LU 9827313".  *Id*., pp. 38, 48, 49, 42.

5           The parties have engaged in a minor dispute over this matter of the policy or certificate number.

6   Defendants assert that one copy offered by plaintiffs of the Lexington London documents bearing the

7   policy number LU9827313 is simply a broker's draft, not the actual certificate.  Defendants' Opposition,

8   Dkt. # 97, p. 8.  Lexington's representative, Mr. Bill Lamond, testified that the "LU" number is not a

9   Lexington London policy number, because he knew from experience that Lexington London uses policy

10  prefixes of 870.  Declaration of Jeffrey Gesell, Dkt. # 88, Exhibit A, Lamond Deposition, p. 16.   Yet

11  another document offered by plaintiffs from the reinsurance documents gives "901/LU9827313" as the

12  policy number, and "8704871" as the reference number.  Declaration of Lew Leigh, Dkt. # 85, Exhibit C,

13  pp. 1-3.    Therefore, it appears the two numbers are simply different ways of referring to the same

14  certificate.

15          Paul Hine, vice president of property claims for Lexington, has certified a copy of the policy as a

16  true and correct copy of the Lexington London Policy No. 8704871, the Lexington (UK) certificate of

17  reinsurance.  Declaration of Paul Hine, Dkt. # 87.   The certificate states that

18          [t]his Reinsurance is subject to all terms, clauses and conditions as original except as provided
        herein, and to follow the settlements or other payments of whatsoever nature made by the
19          Original Underwriters arising out of and in connection with the original insurance and to
        bear its proportion of any expenses incurred whether legal or otherwise in the investigation
20          and defense of any claim hereunder.

21          In the event of a claim under the original policy Reinsurers hereon agree that, any payment
        hereon shall take place at the same time as settlement or advance of funds (by Letters of
22          Credit or otherwise) under the said original policy.

23  *Id,* Exhibit A.

24          The Certificate of Facultative Reinsurance issued for the period 12/31/98 to 12/31/99 by

25  Lexington (US) states that

26          [t]he liability of the Reinsurer shall follow the terms and conditions of the Company's
        policy furnished to the Reinsurer at the effective date of this Reinsurance Certificate
27          unless otherwise specifically provided herein by endorsement made a part of this Certificate.

28

ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT - 6

. . . .

The Company agrees that it will promptly investigate and will settle or defend all claims under the policy reinsured hereunder and that it will notify Reinsurer promptly of any event or development which the Company reasonably believes might result in a claim against Reinsurer. . . .

. . . .

Upon receipt by Reinsurer of satisfactory evidence of payment of a loss for which reinsurance is provided hereunder, Reinsurer shall promptly reimburse the Company for its share of the loss and loss expense, subject to paragraph 4 of these General Conditions.

Declaration of Lew Leigh, Dkt. # 85, Exhibit C.   In this reinsurance certificate, "the Company" refers to WCIA, the reinsured entity.

Plaintiffs assert in their motion for partial summary judgment that Lexington is obliged under the "follow the fortunes" or "follow the settlements" rule to reimburse WCIA for the payment it made to the City.   The "follow the fortunes" doctrine "protects the risk transfer mechanism by providing that covered losses pass uninterrupted along the risk transfer chain.   The same legal obligations that define the insurers' obligations must apply to reinsurers as well."   *North River Insurance Co.*, 52 F. 3d at 1205. The doctrine thus requires payment where the insurer's good faith payment is at least "arguably within the scope of the insurance coverage that was reinsured."   *Id*. at 1206, *quoting Christiana General Insurance Corp. v. Great American Insurance Co*., 979 F. 2d 268, 280 (2d Cir. 1992).   The "follow the fortunes" doctrine creates an exception to the general rule that the decision-making process is subject to de novo review.   *Id*.

However, even under the "follow the settlements" or "follow the terms and conditions of the policy" clauses here, the reinsurer is liable only for a loss of "the kind reinsured." *Id.* The reinsurer is not bound to pay where the primary insurer paid on a claim that was completely outside the scope of the policy, and not in good faith. *Id.* This distinction between insured and uninsured risks is particularly important where, as here, the reinsurance is facultative, because the reinsurer accepts only specific risks, as set forth in the underlying policy. *Id*. at 1207.   The question, then, is whether the error in design of the bridge is a risk covered by the WCIA policy.

The 1998-1999 WCIA policy is described on the declarations page as covering "all risk of direct physical loss including fire and lightning, extended coverage, all other perils, flood and earthquake

ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT - 7

providing coverage for all real and personal property . . . as more fully defined in the forms attached

thereto."  Declaration of Lew Leigh, Dkt. # 85, Exhibit A.  Section II, Paragraph (1) of the policy, under

"Coverage," states,

> Subject to the terms, conditions and exclusions hereinafter contained, this Policy insures
> all property of every description of an insurable nature, both real and personal (including
> improvements and betterments), of the Pool member or property of others in the care, custody
> or control of the Pool member, for which the Pool member is liable or under obligation to
> keep insured.

Id., p. 10.   Paragraph (3) of Section II, under "Property Exclusions," states

> (9) As respects course of construction the following exclusions shall apply:
>
> > (a) The cost of making good, faulty or defective workmanship, material, construction
> > or design, but this exclusion shall not apply to damage resulting from such faulty or
> > defective workmanship, material, construction or design.

Id., p. 14.  As the loss was not incurred in the course of construction, this exclusion does not apply.

Under Section IV of the WCIA policy title "General Conditions," Paragraph (2) provides as

follows:

**2) PERILS EXCLUDED**

This Policy does not insure against any of the following:

> A) Loss or damage caused by or resulting from moths, vermin, termites, or other insects,
> **inherent vice**, latent defect, wear, tear or gradual deterioration, contamination, rust, wet
> or dry rot, mold, unless caused by a peril not excluded, or loss or damage by normal settling,
> shrinkage or expansion in building or foundation.

Id., p. 32 (emphasis added).

It is defendants' position that the design error is an inherent vice and thus specifically excluded

from coverage under the 1998-1999 policy.  Plaintiffs' argument in opposition is based in part upon the

fact that the 2003-2004 WCIA policy specifically excludes error in design, while the 1998-199 policy did

not.[3]  Thus, according to plaintiffs' reasoning, because the 1998-1999 policy failed to specifically mention

_____

[3]The 2003-2004 WCIA policy states, under the "perils excluded" paragraph of Section IV,

This Policy does not insure against any of the following: Loss or damage caused by or resulting
from moths, vermin, termites, or other insects, **inherent vice, latent defect, faulty materials, error in
design, faulty workmanship**, wear, tear or gradual deterioration, contamination, rust, corrosion, wet or
dry rot, unless physical loss of damage not otherwise excluded ensues and then only for such ensuing
loss.

ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT - 8

error in design as an excluded peril, it was not excluded.    However, that argument fails if design error is subsumed within the term "inherent vice."

Regarding inherent vice, the Washington State Court of Appeals has stated as follows:

An inherent vice is defined by various courts as " 'any existing defects, diseases, decay or the inherent nature of the commodity which will cause it to deteriorate with a lapse of time.'"  It is also defined "as a cause of loss not covered by the policy, does not relate to an extraneous cause but to a loss entirely from internal decomposition or some quality which brings about its own injury or destruction.  The vice must be inherent in the property for which recovery is sought."

*Port of Seattle v. Lexington Insurance Company, et al*., 111 Wash. App. 901, 909-910 (Wash. App. Div.II, 2002) *quoting Missouri Pacific R.R. Co. v. Elmore & Stahl*, 377 U.S. 134, 136 (1964); *Vana Trading Co. V. S.S. "Mette Skou"*, 556 F. 2d 100, 104 (2d Cir); *cert. denied*, 434 U.S. 892 (1977); *Archer-Daniels Midland Co. v. Phoenix Assurance Co.*, 975 F. Supp. 1129, 1136 (S.D.Ill. 1997); *U.S. Steel International, Inc., v. Grandheim*, 540 F. Supp. 1326, 1329-30 (S.D.N.Y. 1982); *Employers Causalty Co. v. Holm*, 393 S.W. 2d 363, 367 (Tex. App. 1965).

In *Port of Seattle*, the Port sought coverage for expenses related to the Y2K computer problem. The policy at issue provided coverage for damage related to computer viruses, but excluded inherent vice.   The court first determined that the Y2K problem was not a computer virus.   Then, after reviewing other cases, such as one in which porous bricks used on the exterior of a home caused damage to a home, the court found that the Y2K problem was an inherent vice.  *Id*., at 912.

Similarly, here the design defect which caused the City's loss was an inherent vice.   It was inherent not in the nature of bridges in general, but of this particular bridge as it was designed and delivered to the City.   The ill-designed bridge "[brought] about its own injury" and no application of external events was necessary.  *Id*., at 910.  As this type of design error falls squarely within the meaning of  "inherent vice" as it has been defined by the courts, it was not necessary that it be spelled out separately in the 1998-1999 policy for the exclusion to apply.   The subsequent change in language to include error in design as an excluded peril was not an addition or amendment, but simply a clarification of the scope of the term "inherent vice."

Declaration of Lew Leigh, Dkt. # 85, Exhibit E (emphasis added).

ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT - 9

As stated above, with facultative reinsurance, the reinsurer accepts only specific risks, as set forth in the underlying policy. *North River Insurance Co.*, 52 F. 3d at 1207.  Under either the "follow the settlements" or "follow the terms and conditions of the policy" clauses here, the reinsurer is liable only for a loss of "the kind reinsured." *Id*. at 1205.  Thus, the reinsurer is not bound to pay where the primary insurer paid on a claim that was completely outside the scope of the policy, and not in good faith.  *Id.* The Court finds that the claim for damage to the bridge was outside the scope of the WCIA policy because the loss was due to an excluded "inherent vice."  The Court further finds that the claim was not paid in good faith, because WCIA paid the claim late in this action, after discovery had closed, and without further notice to or consultation with defendants, knowing that defendants had already declined to cover the claim under the "inherent vice" exclusion.

CONCLUSION

Summary judgment is proper only if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." F.R.Civ. P. 56(c).  The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotrex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   If the moving party satisfies this burden, the opponent must set forth specific facts showing that there remains a genuine issue for trial. F.R.Civ. P. 56(e).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  It is not the court's function at the summary judgment stage to determine credibility or to decide the truth of the matter.  *Id*. at 249-50.   Rather, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id*.   at 255.

Here, the parties are in agreement that no material facts are in dispute, and the matter should be resolved by the Court as a matter of law.  The Court has construed the facts in the light most favorable to plaintiff, and has set forth the facts as recited by plaintiff.

ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT - 10

1    The interpretation of an insurance policy is a matter of law, and summary judgment is appropriate

2  if the contract has only one reasonable meaning when viewed in light of the parties' objective

3  manifestations.  *Port of Seattle,* 111 Wash. App. at 907.  The policy should be given a practical and

4  reasonable interpretation.  *Id*. at 908.  Exclusionary clauses, such as the "inherent vice" clause here, are to

5  be construed strictly against the insurer.  *Id*.

6    Applying these principles, the Court finds that even a strictly-construed "inherent vice" clause

7  encompasses the error in design of the bridge.  It was that design error, not any external event, which led

8  directly to the cracks in the girders, and caused the City's loss for costs of repair.   Defendants are thus

9  entitled to judgment as a matter of law, finding that the loss was not within the scope of the WCIA

10  policy, and therefore defendants have no obligation as reinsurers to follow the settlement and reimburse

11  WCIA for the payment to the City.   Nor are defendants liable for any portion of the progressive loss that

12  followed, as such loss (the increased cracking) flowed directly from the initial error in design of the

13  girders.

14    In light of this ruling, it is not necessary for the Court to address plaintiffs' alternative bases for

15  partial summary judgment, which go to defenses raised by defendants.  Defendants' motion for summary

16  judgment is therefore GRANTED, and plaintiffs' motion for partial summary judgment is DENIED.

17    The Clerk shall enter judgment in favor of defendants in this matter, and strike the October 1,

18  2007, trial date from the Court's calendar.

19    DATED this    Day of September 2007.

20

21

22    RICARDO S. MARTINEZ

23    UNITED STATES DISTRICT JUDGE

24

25

26

27

28

ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT - 11